# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| JAMES SMITH, derivatively on behalf of COREWEAVE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> MICHAEL INTRATOR, BRIAN VENTURO, KAREN BOONE, JACK COGEN, GLENN HUTCHINS, MARGARET WHITMAN, NITIN AGRAWAL, and BRANNIN MCBEE, <br><br> Defendants, <br><br> -and- <br><br> COREWEAVE, INC., <br><br> Nominal Defendant. | Case No. <br><br><br><br> **JURY TRIAL DEMANDED** |

Plaintiff James Smith ("Plaintiff"), derivatively on behalf of CoreWeave, Inc. ("CoreWeave" or the "Company"), brings the following complaint against the Company's board of directors (the "Board") and executive officers for breaches of fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, and violation of the federal securities laws. Except for allegations specifically pertaining to Plaintiff and Plaintiff's own acts, the allegations in the Complaint are based upon information and belief, which include but are not limited to: (i) the Company's public filings with the United States Securities and Exchange

Commission (the "SEC"); (ii) pleadings filed in *Masaitis v. CoreWeave, Inc. et al.* (D. N.J. Case 2:26-cv-00355-JKS-LDW) (the "Securities Class Action"); (iii) corporate governance documents available on the Company's website; (iv) media reports; and (v) other publicly available information.

## NATURE OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff, a stockholder of CoreWeave, on behalf of the Company against the Defendants (as defined herein). This action alleges breaches of fiduciary duty by the Board and senior executive officers occurring from at least March 28, 2025, to December 15, 2025 (the "Relevant Time Period"). During that time the Defendants caused or allowed CoreWeave to issue or make materially false and misleading statements concerning the Company's financial condition and business operations.

2.      CoreWeave calls itself the "AI Hyperscaler driving the AI revolution." The Company offers software and services through the CoreWeave Cloud Platform for managing artificial intelligence ("AI") infrastructure and applications. The CoreWeave Cloud Platform is hosted on a network of 32 interconnected data centers with 360 megawatts of active power, though the Company's contracted power is approximately 1.3 gigawatts. Without these data centers, CoreWeave cannot operate.

3.      On March 10, 2025, weeks before its initial public offering, CoreWeave announced that OpenAI, an AI research and development company, would use the CoreWeave Cloud Platform in a deal valued at up to $11.9 billion. As part of this transaction, OpenAI agreed to invest $350 million in CoreWeave.

4.      Since that time, the Defendants have consistently represented to investors and the public that the demand for CoreWeave's services was "robust" and "unprecedented." The Company issued positive revenue guidance throughout the Relevant Time Period based on the advertised demand. Yet no statements acknowledged how vulnerable the Company's operations were to the Company reliance on a single data center supplier.

5.      On November 10, 2025, CoreWeave announced its financial results for the quarter ended September 30, 2025. During a conference call with investors and analysts to discuss the announced financial results, the Company announced that it had lowered its revenue guidance for 2025, due to "delays related to a third-party data center developer who is behind schedule." The following day, Defendant Intrator conceded that the delays involved a data center provider, not just one data center, during an interview on CNBC's "Squawk on the Street," hosted by Jim Cramer.

6.      The truth was revealed on December 15, 2025, when the Wall Street Journal published an article reporting the true scope and severity of CoreWeave's

3

data center delivery issues. The article revealed that weather-related delays would delay the completion of a data center cluster intended for OpenAI by several months, that other data centers would be delayed due to revised design plans, and that CoreWeave was aware of these delays months before announcing its lowered revenue guidance in November 2025.

7.      Through this action, Plaintiff seeks to hold the Board and executive officers accountable for making or causing the Company to make false and misleading statements, as well as the inadequate internal controls that allowed the misconduct to occur, in breach of their fiduciary duties to the Company.

## PARTIES

### A.      Plaintiff

8.      Plaintiff is a current shareholder of CoreWeave and has continuously held CoreWeave stock during all times relevant hereto and is committed to retaining CoreWeave shares through the pendency of this action to preserve his standing. Plaintiff will adequately and fairly represent the interests of CoreWeave and its shareholders in enforcing its rights.

### B.      Nominal Defendant

9.      Nominal Defendant CoreWeave is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices are located at 290 W Mt. Pleasant Ave., Suite 4100, Livingston, New Jersey 07039.

CoreWeave common stock trades on the on the Nasdaq Market ("NASDAQ") under the ticker symbol "CRWV."

## C.    Individual Defendants

10.    Defendant Michael Intrator is a co-founder of the Company and has served as CEO, President, and Chairman of the Board since 2017.

11.    Defendant Brian Venturo is a co-founder of the Company and has been a director of the Company since 2019. Defendant Venturo served as Chief Technology Officer of the Company from 2017 until March 2024. Defendant Venturo has served as CoreWeave's Chief Strategy Officer since March 2024.

12.    Defendant Karen Boone has been a director of the Company since January of 2025.

13.    Defendant Jack Cogen has been a director of the Company since 2017.

14.    Defendant Glenn Hutchins has been a director of the Company since February 2025.

15.    Defendant Margaret Whitman has been a director of the Company since March of 2025.

16.    Defendants Intrator, Venturo, Boone, Cogen, Hutchins, and Whitman are herein referred to as "Director Defendants."

17.    Defendant Nitin Agrawal has served as Chief Financial Officer of the Company since 2024.

18.    Defendant Brannin McBee is a co-founder of the Company, served as Chief Strategy Officer of the Company from 2017 to 2024, and currently serves as Chief Development Officer of the Company.

19.    Defendants Intrator, Venturo, Agwal, and McBee are herein referred to as "Officer Defendants."

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b), 20(a), and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), 78t-1, 78u-4(f), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

21.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22.    Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

6

23.    Venue is proper in this court under 28 U.S.C. § 1391, because CoreWeave is headquartered in this District, and a significant amount of the conduct at issue took place and had an effect in this District.

## FURTHER SUBSTANTIVE ALLEGATIONS

### A.    The False and Misleading Statements

24.    CoreWeave offers software and services through the CoreWeave Cloud Platform for managing AI infrastructure and applications. The Company provides access to the CoreWeave Cloud Platform through committed long-term contracts. However, the Company only recognizes the revenue from the contract after data center infrastructure and systems are acquired and installed for that particular contract. Most of CoreWeave's data center space is leased from data center providers. While it generally takes three months from execution of a contract to installation of the data center infrastructure, it is dependent on the data center owner. Any delays in installation would similarly delay revenue recognition.

25.    On March 31, 2025, CoreWeave filed its Prospectus on Form 424B4 (the "Prospectus") with the SEC in connection with its initial public offering ("IPO"). The Prospectus stated that CoreWeave is "the AI Hyperscaler TM driving the AI revolution" – "[a] cloud provider or technology company that is capable of delivering computing infrastructure and services at massive scale, typically through large data centers and geographically distributed networks."

26.    The Prospectus stated that one of CoreWeave's "competitive strengths," which the Company "believe[s] set us apart from the generalized cloud providers in the industry," was its ability to "deploy[] AI infrastructure at massive scale":

Competitive Strengths. Our key competitive strengths, which we believe set us apart from the generalized cloud providers in the industry, include: . . . We operate at scale. We benefit from a network of 32 active purpose-built data centers that together ran more than 250,000 GPUs as of December 31, 2024. Our specialization in deploying AI infrastructure at massive scale enables us to serve some of the world's leading providers of AI who require massive deployments, benefit from clear economies of scale, and detect issues and derive insights from across our AI infrastructure sooner than our competitors.

\*    \*    \*

Our ability to abstract away the complexity our customers would face in assembling, managing, and deploying this infrastructure themselves establishes us as a critical partner and leads to long-term, durable relationships that have the potential to expand over time. As evidence of this, three of our top five committed contract customers by total contract value ("TCV") as of December 31, 2024 signed agreements for additional capacity within 12 months of their respective initial purchase dates. These agreements, measured during each respective 12-month period from the initial date of signing, represent a cumulative increase of approximately $7.8 billion in committed spend and a multiple of approximately 4x on initial contract value. Our deep relationships with customers are a competitive advantage, and our first-to-market track record with highly performant technology gives customers confidence in choosing CoreWeave.

\*    \*    \*

Our purpose-built technology stack is augmented by our lifecycle management and monitoring software, Mission Control and Observability, and our advanced cluster validation, proactive health

8

checking capabilities, and observability capabilities. Our AI cloud runs in a distributed network of 32 active purpose-built data centers, which are specifically engineered to support high intensity AI workloads with features including enhanced power, liquid cooling, and networking components, reinforcing the robustness of our entire technology stack. Our Third-Party Tooling and Solutions further enhance this flexibility by providing a composable architecture that allows customers to customize their solution by integrating additional third party tools.

27. On May 14, 2025, CoreWeave held a conference call to discuss its financials for the quarter ended March 31, 2025 (its first as a public company). During the call, Defendant Agrawal stated:

For 2025, we expect revenue to be in the range of $4.9 billion to $5.1 billion. We expect adjusted operating income in the range of $800 million to $830 million and CapEx of $20 billion to $23 billion due to increased and accelerated investment in our platform to meet customer demand. This FY 2025 guidance reflects the OpenAI contract we signed in March, the recent $4 billion expansion with the large AI enterprise, and the impact of Weights and Biases.

28. In response to a question concerning CoreWeave's quarterly revenue performance, Defendant Intrator stated:

With regards to the revenue beat, what you are seeing is a concerted strategic effort by the company to pull in the investment in the infrastructure to be able to build and scale and deliver compute more quickly to the client contracts that we have. And so, we've really made the focus on speed of delivery and quality of delivery to be a primary focus for the company. And that beat was really attributed to our ability to drive that motion within our build delivery system.

29. On May 15, 2025, CoreWeave filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2025 (the "Q1 2025 10-Q"), stating that Company's quarterly

9

revenue performance, representing a 420% year-over year increase, reflected its "ability to rapidly scale our operations":

> Revenue for the three months ended March 31, 2025 increased by $793 million, or 420%, compared to the three months ended March 31, 2024. This substantial growth was related to increased demand from both existing and new customer contracts and our ability to rapidly scale our operations, emphasizing the strength of our customer relationships and our ability to meet the evolving needs of the industry.

30.     On July 7, 2025, CoreWeave announced the Core Scientific Acquisition:

> Verticalizing the ownership of Core Scientific's high-performance data center infrastructure enables CoreWeave to significantly enhance operating efficiency and de-risk our future expansion, solidifying our growth trajectory. Owning this foundational layer of our platform will enhance our performance and expertise as we continue helping customers unleash AI's full potential.

31.     On August 12, 2025, CoreWeave held a conference call to discuss its financial results for the quarter ended June 30, 2025 (the "Q2 2025 Earnings Call"). During the Q2 2025 Earnings Call, Defendant Intrator stated:

> Our ability to scale state-of-the-art infrastructure will further be bolstered by the more than $6 billion data center investment we've announced in Lancaster, Pennsylvania as well as a large data center project in Kenilworth, New Jersey, that we are co-developing via a joint venture with Blue AL. These new sites are perfect examples of our broader data center strategy, which allow us to provide a mix of both large-scale training and low-latency inference compute across the country.

*       *       *

10

[I]n terms of the supply side, at the end of the day, right now, it's the powered shells that are the choke point that is causing the struggle to get enough infrastructure online for the demand signals that we are seeing, not just within our company, it's the massive demand signals that you're seeing across the industry. And at the end of the day, what we are looking at, and I think what you're hearing across the board is that this is a structurally supply-constrained market. It is a market that is really working hard to try and balance and there are fundamental components at the powered shell, at the power in terms of the electrons moving through the grid, at the supply chains that exist within the GPUs, the supply chains that exist within the mid-voltage transformers. There's a lot of different pieces that are constrained. But ultimately, the piece that is the most significant challenge right now is accessing powered shells that are capable of delivering the scale of infrastructure that our clients are requiring.

32.    Although Defendants admitted these vulnerabilities, instead of announcing revised revenue guidance for the year, Defendant Agrawal announced "[f]or the second quarter in a row, we are raising our full year revenue guidance":

For the second quarter in a row, we are raising our full year revenue guidance. For 2025, we now expect revenue in the range of $5.15 billion to $5.35 billion, a $250 million increase from our prior guidance of $4.9 billion to $5.1 billion, driven by continued strong customer demand. We expect adjusted operating income in the range of $800 million to $830 million, unchanged from our prior guidance as we remain cost disciplined while rapidly scaling our deployments at an unprecedented rate to end the year with over 900 megawatts of active power. We expect CapEx in the range of $20 billion to $23 billion, unchanged from our prior guidance in the backdrop of continued strong customer demand. A significant portion of our full year CapEx will fall in Q4 due to the timing of go-live dates of our infrastructure.

33.    Again, during an appearance at Deutsche Bank's 2025 Technology Conference on August 27, 2025, Defendant Agrawal acknowledged limitations in providing customers with the infrastructure needed to provide its contracted services

11

but, yet again, did not announce a downward revision to its full-year revenue guidance:

> The demand remains relentless. And we're still in a chronically supply-constrained environment where capacity constraints, especially around powered shell capacity is the biggest constrained driver for our growth. We're still in an environment where demand outstrips supply . . . .

34.    On September 9, 2025, Defendants appeared at the Goldman Sachs Communacopia + Technology Conference 2025, whereat Defendant McBee stated as follows:

> And Mike [Intrator] articulated this earlier, we've been consistent in this messaging of there is no ability to solve the demand profile that is in the market with the capacity that's available today, right? And capacity being powered shell data center infrastructure. That problem is continuing to persist and is honestly worsening. I would say what we've observed over the past 4 to 6 weeks is yet another inflection in demand. And that demand is . . . it's [AI models that can execute] inference. . . . And what's interesting is it's not thousands or tens of thousands of GPUs. It's hundreds to millions of GPUs. It's at massive scale and at these volumes that no one ever anticipated before. So what is the demand climate today? I'd say it's as tight as it's ever been. There is no solution in sight to be able to bring enough infrastructure into the market to solve what it needs to continue scaling."

35.    Again, despite admitting that vulnerabilities on infrastructure for CoreWeave's development and capability to serve its customers, Defendants did not revise the recently raised full-year revenue guidance provided on the Q2 2025 Earnings Call, thereby impliedly represented that the Company's infrastructure access was adequate enough to meet its demands and to meet the figures represented.

36.     These statements were materially false and misleading because they failed to disclose that CoreWeave's ability to meet customer demand for its service was highly dependent on data center suppliers, the scope and severity of the risk that CoreWeave's reliance on a single third-party data center supplier presented for CoreWeave's ability to meet customer demand for its services, and that delays in infrastructure installation would be reasonably likely to have a material negative impact on the Company's revenue.

## B.     The Truth is Revealed

37.     On November 10, 2025, CoreWeave issued a press release reporting its financial results for the quarter ended September 30, 2025. On the same day, CoreWeave held its Q3 2025 Earnings Call. During the call, Defendants announced lowered guidance for revenue, operating income, capital spending, and active power capacity for the year 2025.

38.     During the Earnings Call, Defendant Intrator disclosed that the Company's expectations were "affected by temporary delays related to a third-party data center developer":

> While we are experiencing relentless demand for our platform, data center developers across the industry are also enduring unprecedented pressure across supply chains. In our case, we are affected by temporary delays related to a third-party data center developer who is behind schedule. This impacts fourth quarter expectations, which Nitin will discuss shortly. Having said that, the customer affected by the current delays has agreed to adjust the delivery schedule and extend the expiration date. As a result, we maintain the total value of the original

13

contract and the customer preserves their capacity for the full duration of the initial agreement, demonstrating the confidence they have in our ability to provide the most performant solutions in market.

39.    During the call, Defendant Agrawal provided further details on CoreWeave's reduced revenue guidance for the 2025 fiscal year:

As mentioned, the delays in powered-shell delivery associated with the data center provider will have an impact on our fourth quarter results. These delays are temporary, and as Mike noted, the affected customer has agreed to adjust the delivery schedule to preserve their capacity for the full duration and the total value of the original agreement.

With that backdrop, we now expect 2025 revenue in the range of $5.05 billion to $5.15 billion. In addition, we anticipate 2025 adjusted operating income between $690 million to $720 million . . . .

40.    During the question-and-answer portion of the Q3 2025 Earnings Call, Defendant Intrator said that the delays referenced above only implicated "one data center," contradicting his earlier statements:

There was a problem at one data center that's impacting us. But there are 32 data centers in our portfolio, all of them are progressing to one extent or another. And so that is -- each one of those is independent. . . . This one data center will catch up and then we will move forward from there.

41.    On the same call, Defendant Agrawal reasserted that the delays implicated a "single provider – data center provider."

42.    On this news, CoreWeave's stock price fell $17.22 per share, or 16.31%, to close at $88.30 per share on November 11, 2025.

14

43.    The next day, Defendant Intrator appeared on CNBC's "Squawk on the Street." During the interview, which CNBC published in an article entitled "CoreWeave CEO Won't Say if Core Scientific Caused Data Center Delays, Both Stocks Plunge," Defendant Intrator continued to minimize the scope of the delays that caused CoreWeave to revise down its revenue guidance:

> I am proud [of] all the things we accomplished this quarter. I am proud of the infrastructure that we brought online. I am proud of the incredible progress we've made within our software. I am proud that we were once again identified as the singular best solution to deliver artificial intelligence to consumers. I am proud of our backlog build.
>
> *    *    *
>
> Quite frankly, every single part of this quarter went exactly as we planned, except for one delay at a singular data center . . . "
>
> *    *    *
>
> You're going to see the infrastructure that was scheduled to be brought on in Q4 coming online in Q1, almost entirely, there'll be some that kind of comes on in Q2. You know, you're building massive scale infrastructure. It's very physical, it's very large, it requires coordination across all of the trades, physical construction, and there is a delay that hit, this delay will clear itself and the infrastructure will be brought online.

44.    When asked whether CoreWeave was "losing any customers," Defendant Intrator responded:

> No, absolutely not. We're not losing any customers. What's really important is all of the contracts that reside within those data centers are being shifted out by the clients of ours. So, there's no revenue lost. The only impact on us is a delay of a quarter that you're going to see clear itself shortly.

15

45.     However, it was not until December 15, 2025 that the truth was fully revealed. That day, the Wall Street Journal published an article entitled "CoreWeave's Staggering Fall From Market Grace Highlights AI Bubble Fears." The article reported that inclement weather had caused a 60-day delay in the construction of a "major AI data-center complex." The article noted that CoreWeave had planned to lease the "huge data-center cluster" to OpenAI once completed, but that "the completion date" for the site "has been pushed back several months." The article revealed that the company building the data center had "flagged weather-related delays in August" and had "pushed back certain construction timelines in order to make design enhancements" in February – months before the Company announced a downward revision of revenue guidance.

46.     On this news, CoreWeave's stock price fell $2.85 per share, or 3.39%, to close at $69.50 per share on December 16, 2025.

**C.     Defendants' Misconduct Has and Continues to Harm the Company**

47.     As a direct and proximate result of the Defendants' conduct, the Company has been harmed and will continue to be. The harm includes, but is not limited to, the costs already incurred and to be incurred defending the Company in the Securities Class Action, as well as costs to be incurred in remediating deficiencies in the Company's internal controls.

16

48. CoreWeave's reputation and goodwill have also been damaged by the Defendants' misconduct.

**D.      The Board Breached its Fiduciary Duties**

49. As officers and/or directors of CoreWeave, the Defendants owed CoreWeave fiduciary duties of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage CoreWeave in a fair, just, honest and equitable manner. The conduct of the Director Defendants involves a knowing or reckless violation of their obligations as directors and officers of CoreWeave, the absence of good faith on their part, and a reckless disregard for their duties to the Company that Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

50. Defendants, because of their positions of control and authority as directors and/or officers of CoreWeave, were able to and did exercise control over the wrongful acts complained of herein. As officers and/or directors of a publicly-traded company, the Defendants had a duty to prevent the dissemination of inaccurate and untruthful information regarding CoreWeave's financial condition, performance, growth, operations, financial statements, business, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's common stock would be based upon truthful and accurate information.

51.     To discharge their duties, the officers and directors of CoreWeave were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors and CoreWeave were required to, among other things:

(a)     Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the Company's stockholders;

(b)     Conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(d)     Oversee public statements made by the Company's officers and employees as to the financial condition of the Company at any given time, including ensuring that any statements about the Company's financial results and prospects are accurate, and ensuring that the Company maintained an adequate system of financial controls such that

18

the Company's financial reporting would be true and accurate at all times;

(e)   Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(f)   Maintain and implement an adequate and functioning system of internal controls to ensure that the Company complied with all applicable laws, rules, and regulations; and

(g)   Ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

52.   The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders, which the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

53.     The Board's Audit Committee is tasked with overseeing CoreWeave's financial reporting system and assisting the Board with its oversight of the adequacy and effectiveness of CoreWeave's internal controls over financial reporting and its disclosure controls and procedures. Specifically, according to the Audit Committee's charter, the Audit Committee's responsibilities include:

- Prior to distribution to the public, review and discuss with management and the Independent Auditors, the Company's quarterly and annual financial results, earnings press releases and earnings guidance provided to analysts and rating agencies, and other public announcements regarding the Company's operating results; and

- Review and discuss with the Company's management and the Independent Auditors, and provide oversight over, the design, implementation, adequacy and effectiveness of the Company's accounting and financial processes and systems of internal controls and material changes in such controls, including any control deficiencies, significant deficiencies and material weaknesses in their design or operation.

54.     In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, Defendants Boone, Cogen, and Whitman (the "Audit Committee") conducted little, if any, oversight of the Company's internal controls over financial reporting, resulting in materially false and misleading statements regarding the Company's business and consciously disregarded their duties to monitor such controls. The Audit Committee's complete failure to perform their duties in good faith resulted in misrepresentations to the public and the Company's stockholders.

55.    In addition, as officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act, the Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to make false and misleading statements of material fact about the Company's maintaining adequate internal controls and compliance with applicable rules and regulations.

56.    The Defendants' flagrant violations of their fiduciary duties and unwillingness to heed the requirements of their Audit Committee Charter have inflicted and will continue to inflict significant harm on CoreWeave.

## **DERIVATIVE ALLEGATIONS**

57.    Plaintiff brings this action derivatively in the right and for the benefit of CoreWeave to redress injuries suffered by Corewave as a direct result of the Director Defendants' breaches of fiduciary duty. CoreWeave is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

58.    Plaintiff will adequately and fairly represent the interests of CoreWeave in enforcing and prosecuting the Company's rights.

59.    Plaintiff was a stockholder of CoreWeave at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is currently a CoreWeave stockholder.

## DEMAND FUTILITY ALLEGATIONS

60.    Plaintiff repeats, re-alleges, and incorporates by reference each and every allegations set forth as though fully set forth herein.

61.    The Corewave Board currently has six members: Defendants Intrator, Venturo, Boone, Cogen, Hutchkins, and Whitman.

62.    Plaintiff has not made any demand on CoreWeave's current Board to institute this action against the Director Defendants, as any pre-suit demand would be excused. The Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

63.    The Director Defendants had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. In addition, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were

22

being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.

64.     The Director Defendants' making or authorization of the false and misleading statements discussed above caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of CoreWeave. The failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required due diligence, constitute breaches of fiduciary duties that have resulted in the Director Defendants facing a substantial likelihood of liability. The Director Defendants could not fairly and fully prosecute this action or any other action concerning the misconduct described above.

### A.    Demand is Excused as to Defendant Intrator

65.     Defendant Intrator is a co-founder and CEO of the Company, as well as Chairman of the Board. Defendant Intrator received compensation of $2.7 million in 2024. Defendant Intrator depends on CoreWeave for his income. In addition, CoreWeave stated in the Prospectus that Defendant Intrator is not independent pursuant to SEC regulations and Nasdaq listing rules.

23

66. As a director, Defendant Intrator had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Intrator was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

67. Defendant Intrator failed to conduct oversight of the Company's internal controls over financial reporting, or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor CoreWeave's controls, Defendant Intrator failed to protect corporate assets.

68. Defendant Intrator was an active participant in the misconduct described above. In addition, Defendant Intrator is a named defendant in the Securities Class Action. Defendant Intrator therefore faces a substantial likelihood of liability.

69. In addition, Defendant Intrator was a co-founder of and served as the CEO of Hudson Ridge Asset Management LLC ("Hudson Ridge") from 2013 to 2018. Defendant Intrator had previously served as Principal Portfolio Manager for Natsource Asset Management LLC ("Natsource"). Defendant Venturo was a Partner at Hudson Ridge from 2013 to 2018, and served as a Portfolio Manager at Natsource while Defendant Intrator served at Natsource. Defendant Cogen was the founder and

CEO of Natsource, and served as CEO there at the same time that Defendants Venturo and Intrator were at Natsource. Defendant Cogen served as a director of Hudson Ridge from 2013 to 2018, the same time period that Defendant Intrator served as Hudson Ridge's CEO. These close ties render Defendant Intrator incapable of independently and disinterestedly considering a demand against Defendants Venturo and Cogen.

### B.    Demand is Excused as to Defendant Venturo

70.    Defendant Venturo is a co-founder of the Company and currently serves as Chief Strategy Officer. Defendant Venturo received compensation of $2.7 million in 2024. Defendant Venturo depends on CoreWeave for his income. In addition, CoreWeave stated in the Prospectus that Defendant Venturo is not independent pursuant to SEC regulations and Nasdaq listing rules.

71.    Defendant Venturo served as a director of the Company during the Relevant Time Period. As a director, Defendant Venturo had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Venturo was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

72. Defendant Venturo failed to conduct oversight of the Company's internal controls over financial reporting, or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor CoreWeave's controls, Defendant Venturo failed to protect corporate assets.

73. Defendant Venturo knowingly or recklessly allowed the Company to make false and misleading statements during the Relevant Time Period. Accordingly, Defendant Venturo breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above.

74. Defendant Venturo faces a substantial likelihood of liability for these breaches, making any demand on Defendant Venturo futile.

75. In addition, Defendant Venturo was a Partner at Hudson Ridge from 2013 to 2018, the same time that Defendant Intrator and served as served as the CEO of Hudson Ridge. Defendant Venturo served as a Portfolio Manager at Natsource during the same time that Defendant Intrator served as Principal Portfolio Manager for Natsource. Defendant Cogen was the founder and CEO of Natsource, and served as CEO there at the same time that Defendants Venturo and Intrator were at Natsource. These close ties render Defendant Venturo incapable of independently and disinterestedly considering a demand against Defendants Intrator and Cogen.

26

### C.    Demand is Excused as to Defendant Boone

76.    Defendant Boone served as a director of the Company during the Relevant Time Period. As a director, Defendant Boone had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Boone was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

77.    Defendant Boone failed to conduct oversight of the Company's internal controls over financial reporting, or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor CoreWeave's controls, Defendant Boone failed to protect corporate assets.

78.    Defendant Boone also served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for reviewing earnings guidance and financial results before they are presented to the public. The Audit Committee was thus responsible for reviewing and approving CoreWeave's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Boone was thus responsible for knowingly or recklessly allowing the improper statements related to the scope and severity of the risk that CoreWeave's reliance on a single third-party data center supplier presented for CoreWeave's ability to meet customer demand for

27

its services, and that delays in infrastructure installation would be reasonably likely to have a material negative impact on the Company's revenue.

79. Defendant Boone faces a substantial likelihood of liability for these breaches, making any demand on Defendant Boone futile.

**D.    Demand is Excused as to Defendant Cogen**

80. Defendant Cogen served as a director of the Company during the Relevant Time Period. As a director, Defendant Cogen had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Cogen was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

81. Defendant Cogen failed to conduct oversight of the Company's internal controls over financial reporting, or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor CoreWeave's controls, Defendant Cogen failed to protect corporate assets.

82. Defendant Cogen also served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for reviewing earnings guidance and financial results before they are presented to the public. The Audit Committee was thus responsible for reviewing and approving CoreWeave's Forms

10-Q and 10-K filed during the Relevant Time Period. Defendant Cogen was thus responsible for knowingly or recklessly allowing the improper statements related to the scope and severity of the risk that CoreWeave's reliance on a single third-party data center supplier presented for CoreWeave's ability to meet customer demand for its services, and that delays in infrastructure installation would be reasonably likely to have a material negative impact on the Company's revenue.

83.    Defendant Cogen faces a substantial likelihood of liability for these breaches, making any demand on Defendant Cogen futile.

84.    In addition, Defendant Cogen served as a director of Hudson Ridge from 2013 to 2018, the same time period that Defendant Intrator served as Hudson Ridge's CEO. Defendant Cogen was the founder and CEO of Natsource and served as CEO there at the same time that Defendants Venturo and Intrator. These close ties render Defendant Cogen incapable of independently and disinterestedly considering a demand against Defendants Venturo and Intrator.

**E.    Demand is Excused as to Defendant Hutchins**

85.    Defendant Hutchins served as a director of the Company during the Relevant Time Period. As a director, Defendant Hutchins had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Hutchins was also required to act in

29

good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

86.    Defendant Hutchins failed to conduct oversight of the Company's internal controls over financial reporting, or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor CoreWeave's controls, Defendant Hutchins failed to protect corporate assets.

87.    Defendant Hutchins knowingly or recklessly allowed the Company to make false and misleading statements during the Relevant Time Period. In addition, Defendant Hutchins knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Hutchins breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Hutchins faces a substantial likelihood of liability for these breaches, making any demand on Defendant Hutchins futile.

### F.    Demand is Excused as to Defendant Whitman

88.    Defendant Whitman served as a director of the Company during the Relevant Time Period. As a director, Defendant Whitman had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Whitman was also required to act in

good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

89. Defendant Whitman failed to conduct oversight of the Company's internal controls over financial reporting, or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor CoreWeave's controls, Defendant Whitman failed to protect corporate assets.

90. Defendant Whitman also served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for reviewing earnings guidance and financial results before they are presented to the public. The Audit Committee was thus responsible for reviewing and approving CoreWeave's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Whitman was thus responsible for knowingly or recklessly allowing the improper statements related to the scope and severity of the risk that CoreWeave's reliance on a single third-party data center supplier presented for CoreWeave's ability to meet customer demand for its services, and that delays in infrastructure installation would be reasonably likely to have a material negative impact on the Company's revenue.

91. Defendant Whitman faces a substantial likelihood of liability for these breaches, making any demand on Defendant Whitman futile.

92. Based on the facts alleged herein, there is a substantial likelihood that Plaintiff will be able to prove that these individuals breached their fiduciary duties

31

by condoning the misconduct and failing to take meaningful action to remedy the resultant harm.

**CLAIMS FOR RELIEF**

**COUNT I**
**Breach of Fiduciary Duty**
**(Derivatively Against The Director Defendants)**

93.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

94.    Each of the Director Defendants owed and owes CoreWeave the highest obligations of loyalty, good faith, due care, and oversight.

95.    Each of the Director Defendants violated and breached their fiduciary duties of loyalty, good faith, candor and oversight to the Company.

96.    The Director Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. In breach of their fiduciary duties, the Director Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

97.    In addition, the Director Defendants further breached their fiduciary duties owed to CoreWeave by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact and allowing the Company to operate with inadequate internal controls which

32

resulted in the misrepresentations and failure to disclose that (i) Defendants had overstated CoreWeave's ability to meet customer demand for its service; (ii) Defendants materially understated the scope and severity of the risk that CoreWeave's reliance on a single third-party data center supplier presented for CoreWeave's ability to meet customer demand for its services; (iii) the foregoing was reasonably likely to have a material negative impact on the Company's revenue; (iv) as a result, the Company's public statements were materially false and misleading at all relevant times. The Director Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact, exposing them to personal liability to the Company for breaching their fiduciary duties.

98.    The Director Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the wrongdoing set forth herein and to fail to maintain adequate internal controls. The Director Defendants had actual knowledge that the Company was engaging in the wrongdoing set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the wrongdoing and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the

33

Company's securities. The Director Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

99.    As a direct and proximate result of the breaches of duty alleged herein, CoreWeave has sustained and will sustain significant damages.

100.    As a result of the misconduct alleged herein, these Defendants are liable to the Company.

101.    Plaintiff, on behalf of ADM, has no adequate remedy at law.

**COUNT II**
**<u>Breach of Fiduciary Duty</u>**
**(Derivatively Against the Officer Defendants)**

102.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

103.    The Officer Defendants are executive officers of the Company. As executive officers, the Officer Defendants owed and owe CoreWeave the highest obligations of loyalty, good faith, due care, oversight, and candor.

104.    The Officer Defendants breached their fiduciary duties owed to CoreWeave by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact, failing to disclose that (i) Defendants had overstated CoreWeave's ability to meet customer demand for its service; (ii) Defendants materially understated the scope and severity of the

risk that CoreWeave's reliance on a single third-party data center supplier presented for CoreWeave's ability to meet customer demand for its services; (iii) the foregoing was reasonably likely to have a material negative impact on the Company's revenue; (iv) as a result, the Company's public statements were materially false and misleading at all relevant times. The Officer Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact.

105. As a direct and proximate result of the breaches of duty alleged herein, CoreWeave has sustained and will sustain significant damages.

106. As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

107. Plaintiff, on behalf of CoreWeave, has no adequate remedy at law.

## COUNT III
### Gross Mismanagement
### (Against All Defendants)

108. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

109. By their actions alleged herein, the Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation

35

110. As a direct and proximate result of the Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages.

111. As a direct and proximate result of the gross mismanagement and breaches of duty alleged herein, CoreWeave has sustained and will sustain significant damages.

112. As a result of the misconduct alleged herein, the Defendants are liable to the Company.

113. Plaintiff, on behalf of CoreWeave, has no adequate remedy at law.

## COUNT IV
### Violations of Section 10(b) and Rule 10b-5 of the Exchange Act
**(Against All Defendants)**

114. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

115. During the Relevant Time Period, the Defendants engaged and participated in a continuous course of conduct designed to falsify the Company's reports filed with the SEC.

116. The Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or

omitting to state material facts necessary in order to make the statements made about the Company not misleading.

117.   The Defendants, as directors and officers of the Company, acted with scienter during the Relevant Time Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Defendants were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

118.   By virtue of the foregoing, the Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT V
## Violations of Section 20(a) of the Exchange Act
### (Against All Defendants)

119.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

120.   The Defendants, as directors and officers of the Company, were, at the time of the wrongs alleged herein, controlling persons of the Company and each of the officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Defendants had the

power and influence, and exercised the same, to cause the Company to engage in the illegal conduct and practices complained of herein.

121.   Plaintiff, on behalf of them, has no adequate remedy at law.

## COUNT VI
## For Contribution Under Sections 10(b) and 21D of the Exchange Act
### (Against the Officer Defendants)

122.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

123.   The conduct of the Officer Defendants, as described herein, has exposed the Company to significant liability under various federal securities laws.

124.   The Company, along with the Officer Defendants are named as defendants in the Securities Class Action that alleges and asserts claims arising under the federal securities laws.

125.   The Company is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein.

126.   If the Company is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of the Officer Defendants, as alleged herein, who have caused the Company to suffer substantial harm through their misconduct. The Company is entitled to contribution and indemnification from the Officer

38

Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

127.   As officers the Officer Defendants had the power or ability to, and did, control or influence, either directly or indirectly, the Company's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

128.   The Officer Defendants liable under § 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

129.   The Officer Defendants, through their misconduct, have damaged the Company and are liable to the Company for contribution.

130.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

### RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment as follows:

A.     Declaring that Plaintiff may maintain this derivative action on behalf of CoreWeave and that Plaintiff is a proper and adequate representative of the Company;

B.     Against all of the Defendants and in favor of CoreWeave for the amount of damages sustained by the Company as a result of the acts and transactions

39

complained of herein;

C.     Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D.     Awarding CoreWeave restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F.     Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 10, 2026                    Respectfully submitted,

**LYNCH CARPENTER, LLP**

*/s/ Gerald D. Wells, III*
Gerald D. Wells, III (SBN:040652001)
1760 Market Street, Suite 600
Philadelphia, PA 19103
T: 267-609-6910
F: 267-609-6955
jerry@lcllp.com

40

**BRIAN MURRAY LAW PLLC**
Brian P. Murray
750 E. Main Street
Suite 620
Stamford, CT 06901
T: 203-246-2368
bmurray@brianmurraylaw.com

**ROWLEY LAW PLLC**
Shane T. Rowley, Esq.
Danielle Rowland Lindahl, Esq.
50 Main Street, Suite 1000
White Plains, New York 10606
T: 914-400-1920
F: 914-301-3514
srowley@rowleylawpllc.com
drl@rowleylawpllc.com

*Counsel for Plaintiff*

41

## VERIFICATION

I, James Smith, am the named plaintiff in the foregoing derivative action. I have read the foregoing Verified Stockholder Derivative Complaint, know the contents thereof, and authorized its filing. The contents alleged therein are true to my own knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true. I further declare that I am a current holder, and have been a holder, of CoreWeave, Inc., common stock during the time period in which the wrongful conduct alleged and complained of occurred.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 3 day of February 2026.

*James Smith*
James Smith (Feb 3 2026 14:09:34 EST)

James Smith